HARTZ, Circuit Judge.
Albuquerque Police Officer Brian Pitzer shot Russell Tenorio when responding to an emergency call. Tenorio sued Pitzer in the United States District Court for the District of New Mexico under 42 U.S.C. § 1983, asserting that Pitzer violated his Fourth Amendment rights by using excessive force. The district court denied Pit-zer’s motion for summary judgment, concluding that there was evidence that Pitzer violated clearly established law under two theories: (1) when Pitzer shot Tenorio he “did not have probable cause to believe that [Tenorio] presented a threat of serious physical harm to [Pitzer] or another person,” ApltApp. at 208, and (2) Pitzer and his fellow officers recklessly created the situation that resulted in the use of deadly force. Pitzer appeals. We have jurisdiction under 28 U.S.C. § 1291 and affirm the denial of summary judgment because the evidence would support a violation of clearly established law under the first theory. We therefore need not ad-, dress the second theory,[1] and remand for further proceedings.
I. BACKGROUND
Although the district court denied summary judgment and has not entered a final judgment, “we have interlocutory jurisdiction over denials of qualified immunity at the summary judgment stage to the extent that they turn on an issue of law.” Romero v. Story, 672 F.3d 880, 882 (10th Cir.2012) (brackets and internal quotation marks omitted). We reduce the quéstion before us to one of law by accepting the district court’s assessment of. the facts, which was based on the parties’ agreement on undisputed facts and the court’s construing the remaining evidence in the light most favorable to Tenorio. See id. at 882-83. Indeed, on an interlocutory appeal from the denial of a summary-judgment motion based on qualified immunity, we are almost always barred from reviewing whether the district court erred in determining that an alleged fact was supported by sufficient evidence. See id. at 883; Lewis v. Tripp, 604 F.3d 1221, 1225-26 (10th Cir.2010) (noting the exceptions).
The district court’s opinion set forth the following facts: On November 11, 2010, at 7:56 p.m., a 911 operator received a call from Hilda Valdez, who told the operator, “I need someone to come over here right away.” Aplt.App. at 204 (internal quotation marks omitted). Ms. Valdez reported that her sister-in-law’s husband, later identified as Tenorio, was intoxicated and hold *1162 ing a knife to his own throat. She said that she was afraid that Tenorio would hurt himself or his wife Michaele. Officers Moore, Hernandez, and Liccione were dispatched in response to the call, and Pitzer also responded. The 911 operator relayed some of the information provided by Ms. Valdez to the Albuquerque Police Department dispatcher, who relayed the following information to the officers:
Male [subject] Russell is [drunk] and [on scene]
[Subject] has a knife to his own throat
[No injuries] at this time
Male has [vandalized] windows in the [location] ...
Male has been violent in the past ...
Male takes meds for seizures ...
Male, [caller] and males wife Michelle are all [on scene] inside the [location] [Caller’s] brother Bob Torres is also [on scene] ...
Offender is in the kitchen [with] the knife
[Caller] is in the living room
Male is still holding the knife in his hand
Male is waving knife around ...
[Caller’s] sister and [caller] are in the living room
Offender and [caller’s] brother are in the kitchen
[Caller] is standing outside the [location] waiting for [officers] ...
Id. at 73-74 (capitalization omitted) (items in brackets are spelled-out abbreviations or translations of police codes).
The officers, all in uniform, arrived on the scene in separate vehicles within eight minutes of the original call. They parked their vehicles a short distance from the residence. About a minute later they approached Ms. Valdez, who was standing outside the house still speaking to the 911 operator. She appeared frightened. Pit-zer had not received crisis-intervention training, but Moore and Liccione had. Moore told Ms. Valdez to end her 911 call. She told the officers: “He’s got a knife. He’s been drinking.... He’s like thirty-seven, thirty-eight years old. Um, we tried to talk to him but he got mad ‘cause we took his beer away from him.” Id. at 205 (internal quotation marks omitted). Pitzer announced that he was “going lethal.” Id. (internal quotation marks omitted). Without asking if there was a hostage or settling on a tactical plan, the officers lined up outside the front door to the residence. Pitzer was in the front with his handgun drawn. Moore was behind him, carrying a Taser, and Liccione was third, with his handgun drawn. Hernandez was behind the other officers, carrying a shotgun loaded with beanbag rounds, but was temporarily occupied in preventing Ms. Valdez from reentering the residence.
The front door was open. The living room’s dimensions were about 14 feet by 16 feet, with the front door on one of the shorter walls. A lamp was on in the room. From his position outside the front door, Pitzer could see two doorways on the opposite wall. The one to his right, which led to the kitchen, was directly across from the front door. Part of the kitchen was obscured by the living-room wall. The officers did not hear raised voices or other sounds suggesting a disturbance. Without announcing his presence, Pitzer entered the living room, followed by Moore and Liccione. Mrs. Tenorio moved into the area of the kitchen visible through the right doorway. Pitzer first said, “Ma’am,” and then, “Please step out here. Let me see your hands, okay?” Id. at 206 (internal quotation marks omitted). At least one of the other officers understood “Please step out here” to be addressed to everyone in the kitchen.
As Mrs. Tenorio moved out of the kitchen, she said, “Russell, put that down.” Id. *1163 She walked into the .living room with her hands up and palms facing the officers. She was followed by Tenorio, who had a blank stare and was carrying a santoku-style kitchen knife with a three-and-a-quarter-inch blade. He was holding the knife loosely in his right hand, his arm hanging by his side, as he walked behind his wife. He was followed by a second man. Hernandez grabbed Mrs. Tenorio and took her outside. Tenorio walked forward into the living room at an “average speed.” Id. at 207 (internal quotation marks omitted). Pitzer saw the knife and yelled, “Sir, put the knife down! Put the knife down, please! Put the knife down! Put the knife down!” Id. (internal quotation marks omitted). When Tenorio was about two and one-half steps into the living room, Pitzer shot him, Moore tased him, and he fell to the floor. The commands and the shooting lasted two or three seconds. The time between the first officer’s arrival and the shooting was less than four minutes. Tenorio was hospitalized for two months as a result of his life-threatening injuries.
The district court analyzed Tenorio’s first theory of liability — that Pitzer shot him when Pitzer lacked probable cause to believe that Tenorio posed a threat of serious harm to anyone — under the four (nonexclusive) factors set forth in Estate of Larsen v. Murr, 511 F.3d 1255, 1260 (10th Cir.2008): “(1) whether the officers ordered the suspect to drop his weapon, and the suspect’s compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.” The court concluded that, a jury could find the first factor to be neutral because even though Pitzer ordered Tenorio to drop his knife, “[a] reasonable jury could find that Defendant did not ‘refuse’ to drop the knife because he was not given sufficient time to comply.” Mem. Op. & Order at 7, Tenorio v. Pitzer, Civ. No. 12-01295 MCA/KBM consolidated with Civ. No. 13-00574 MCA/ KBM (D.N.M. May 28, 2014). It said that a jury could find that the second factor weighed against probable cause because it could find that Tenorio “was holding a small kitchen knife loosely by his thigh and that he made no threatening gestures toward anyone.” Id. On the third factor, the court said that a jury could find that it weighed against probable cause because the jury could find that Tenorio, although walking toward Pitzer, was shot “before he was within striking distance of [Pitzer].” Id. at 8. And it said that a jury could also find that the fourth factor weighed against probable cause because the jury could reasonably find that the information provided to Pitzer “indicated that the only person that [Tenorio] was known to have threatened that night was himself, and that as [Tenorio] walked into the living room he did not raise the knife from his side or make threatening gestures or comments toward anyone.” Id.
II. DISCUSSION
A. Qualified Immunity
“The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (internal quotation marks omitted). In the Fourth Amendment context, “[t]his inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.” Id. at 244, 129 S.Ct. 808 (internal quotation marks omitted). “Ordinarily, in order for the law to be clearly established, there must be a Su *1164 preme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.” Becker v. Bateman, 709 F.3d 1019, 1023 (10th Cir.2013) (internal quotation marks omitted). We do not engage in “a scavenger hunt for prior cases with precisely the same facts” but examine “whether the law put officials on fair notice that the described conduct was unconstitutional.” Clark v. Wilson, 625 F.3d 686, 690 (10th Cir.2010) (internal quotation marks omitted).
The plaintiff bears the burden of establishing both (1) that the defendant violated a constitutional right and (2) that the right had been clearly established by the time of the violation. See Becker, 709 F.3d at 1022. When, as here, the facts are not disputed (at least for the purposes of appeal), our review is de novo. See Aldaba, 777 F.3d at 1154.
B. Excessive-Force Claims
We review Fourth Amendment claims of excessive force under a standard of objective reasonableness, judged from the perspective of a reasonable officer on the scene. See Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). “The reasonableness of [an officer’s] actions depends both on whether the officers Were in danger at the precise moment that they used force and on whether [the officer’s] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.” Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir.1995) (footnote omitted). But “[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.” Graham, 490 U.S. at 396-97, 109 S.Ct. 1865.
The Fourth Amendment permits an officer to use deadly force only if there is “probable cause to believe that there [is] a threat of serious physical harm to [the officer] or to others.” Estate of Larsen, 511 F.3d at 1260 (internal quotation marks omitted). “A reasonable officer need not await the glint of steel before taking self-protective action; by then, it is often too late to take safety precautions.” Id. (ellipsis and internal quotation marks omitted). The four factors noted by the district court are quite significant. But they are only aids in making the ultimate determination, which is “whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.” Id.' The belief need not be correct — in retrospect the force may seem unnecessary — as long as it is reasonable. See id.
C. Application to Officer Pitzer
One could argue that Pitzer appropriately used lethal force. The officers were responding to an emergency call for police assistance to protect against danger from a man who had been violent in the past and was waving a knife around in his home. The man was walking toward Pit-zer in a moderate-sized room while still carrying the knife despite repeated orders to drop it.
But the district court ruled that the record supports some potential jury findings that would establish- Tenorio’s claim— in particular, that Tenorio “did not ‘refuse’ to drop the knife because he was not given sufficient time to comply” with Pitzer’s order; that Tenorio made no hostile motions toward the officers but was merely “holding a small kitchen knife loosely by his thigh and ... made no threatening gestures toward anyone.”; that Tenorio *1165 was shot “before he was within striking distance of [Pitzer]; and that, for all Pitzer knew, Tenorio had threatened only himself and was not acting or speaking hostilely at the time of the shooting. Mem. Op. and Order, supra, at 1163. As previously noted, we cannot second guess the district court’s assessment of the evidence on this interlocutory appeal; and we are comfortable that the evidence, viewed in this light, suffices for Tenorio’s claims.
In fact, our precedents compel this result. Our decision in Zuchel v. City & County of Denver, 997 F.2d 730, 735-37 (10th Cir.1993), as- construed in Walker v. City of Orem, 451 F.3d 1139, 1160 (10th Cir.2006), sets forth the clearly established law that resolves this case.
In Zuchel we reviewed the sufficiency of the evidence to support a jury verdict that Officer Frederick Spinharney had used excessive force against the plaintiffs’ decedent, Leonard Zuchel. We set forth the following evidence, excluding “other evidence more favorable to the [defendant].” Zuchel, 997 F.2d at 737. The manager of a restaurant had called the police to complain that Zuchel had been creating a disturbance at the restaurant. See id. at 735. By the time Spinharney and Officer Teri Hays arrived at the restaurant, Zuchel had departed. See id. They found him around the corner, where he was engaged in “a heated exchange” with four teenagers on bicycles. Id. One shouted to the officers that Zuchel had a knife. See id. According to one uninvolved observer, the officers walked up behind Zuchel; Spinharney told him to shut up; Zuchel turned with his hands up in the air and took “three wobbly steps” toward Spinharney, who was six to eight feet away; and Spinharney shot him. Id. at 736. A second uninvolved observer gave essentially the same account, except that she said that Spinharney was about ten feet from Zuchel when he first shouted; that she heard Spinharney tell Zuchel to “drop it”; and that Zuchel’s left hand was pointing over his shoulder to the teenagers as he turned around and his right hand was by his side. Id. (internal quotation marks omitted). She added that he “was not charging the officer and made no slicing or stabbing motions toward him.” Id. Officer Hays testified that as she and Spinharney approached Zuchel from behind, she hollered “Hey” and “he turned around in a normal fashion.” Id. (internal quotation marks omitted). Then one of the teenagers said, “Watch out: he’s got a knife.” Id. (internal quotation marks omitted). She said that when the officers were about 15 feet from him, Spinharney told Zuchel to “Drop it. Drop it.” Zuchel then “walk[ed] forward at a slow pace.” Id. (internal quotation marks omitted). She moved toward Zuchel; as she did so, she saw nothing in his right hand but could not clearly see his left. See id. When Spin-harney fired, Zuchel was right next to her and less than five feet from Spinharney. See id. The coroner testified that Zuchel’s right arm was directly across his chest when he was shot, indicating that it was not “extended in a threatening manner.” Id. No knife was found. See id.
We held that the evidence was sufficient for the jury to find that the “use of deadly force was not objectively reasonable under the circumstances.” Id. We did not parse the evidence to say precisely what version the jury needed to believe to make that finding. It is possible, for example, that we thought it was necessary for the jury to disbelieve the testimony that Spinharney had told the plaintiff to drop his weapon. But the more natural reading of our opinion is that any discrepancies among the witnesses were irrelevant.
And that is how we construed Zuchel a few years later in Walker. We said that Zuchel “specifically established that where an officer had reason to believe that a *1166 suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect.” 451 F.3d at 1160.
Given the facts that we must accept on this appeal, that standard applies to this case. Tenorio was not charging Pitzer. He had merely taken three steps toward the officer, as had Zuchel. Unspeaking and with a blank stare on his face, he made no aggressive move toward any of the officers with his knife. He was no closer to the officers than Zuchel had been. The district court said that the jury could find that he was not “within striking distance” when he was shot and was only “holding a small kitchen knife loosely by his thigh.” Mem. Op. & Order, supra, at 1163. Zuchel had also been ordered to “drop it.” Unlike in Zuchel, Tenorio actually had a knife. But given the warning by the teenager, the officer in Zuchel could have reasonably believed that Zuchel had one; and, as determined by the district court here, the jury could have found that Tenorio did not have enough time to obey Pitzer’s order. Finally, Tenorio’s behavior before the officers arrived was not more aggressive than what had been reported to Spinharney (it would have been reasonable for Spinharney to infer from the teenager’s warning that Zuchel had brandished a knife during the heated exchange).
We recognize that we distinguished Walker’s statement of the law in our opinion in Estate of Larsen, 511 F.3d 1255. But the distinction we made in that case was that the victim had made “hostile actions toward” the officer. Id. at 1263. We said that “[t]he undisputed facts here show that [the victim] ignored at least four police commands to drop his weapon and then turned and stepped toward the officer with a large knife raised in a provocative motion.” Id. In contrast, the evidence in this case would support a finding that Ten-orio took no hostile or provocative action toward the officers.
We conclude that the district court, given its unreviewable assessment of the evidence, did not err in denying the qualified-immunity motion for summary judgment. We note, however, that because our review is predicated on the district court’s assessment of the evidence in the light most favorable to Tenorio, a contrary judgment may be permissible after a trial to a jury.
III. CONCLUSION
We AFFIRM the district court’s denial of summary judgment.

. See Aldaba v. Pickens, 777 F.3d 1148, 1159 n. 2 (10th Cir.2015) (On review of denial of motion for summary judgment based on qualified immunity, once appellate court determined that initial use of force was excessive, it was unnecessary to determine on appeal "whether the officers’ subsequent actions would likewise constitute excessive force.”).