**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 24, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

PERLA ENRIQUEZ BACA, as the
Personal Representative of Amelia
Baca, deceased,

     Plaintiff - Appellant,

v.

JARED COSPER, in his individual
capacity; THE CITY OF LAS
CRUCES; LAS CRUCES POLICE
CHIEF MIGUEL DOMINGUEZ,

     Defendants - Appellees.

No. 23-2159

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:22-CV-00552-RB-GJF)**

_____

Eric Loman of Jackson Loman Stanford Downey & Stevens-Block, P.C.,
Albuquerque, New Mexico (Daniela Labinoti of Law Firm of Daniela Labinoti,
P.C., El Paso, Texas, with him on the briefs), for Plaintiff-Appellant.

Philomena M. Hausler (Luis Robles with her on the brief), of Robles, Rael &
Anaya, Albuquerque, New Mexico, for Defendants-Appellees.

_____

Before **HARTZ**, **PHILLIPS**, and **EID**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

This case arises from the fatal shooting of Amelia Baca, a 75-year-old, mentally diminished woman in Las Cruces, New Mexico. The Estate filed a complaint alleging that the police officer who shot her acted with excessive force in violation of the Fourth Amendment. The district court granted the officer summary judgment on qualified-immunity grounds, reasoning that the Estate had not raised a genuine dispute of material fact about the officer's claim that he in fact perceived that Ms. Baca presented an immediate danger of serious bodily harm to himself and others. We conclude that the district court erred. Viewing the evidence in the light most favorable to the Estate, a reasonable jury could find a Fourth Amendment excessive-force violation. We also conclude that such a violation would have been clearly established under controlling law on the date of the shooting. So exercising our jurisdiction under 28 U.S.C. § 1291, we reverse the district court's grant of summary judgment and remand for proceedings consistent with this opinion.

## BACKGROUND

### I.    Factual Background

On April 16, 2022, one of Amelia Baca's daughters called 911, reporting that Ms. Baca, her 75-year-old mother who was suffering from dementia, had become aggressive and threatened to kill her and her daughter. Officer Jared Cosper, who was less than one-minute away, heard the dispatcher's description of the scene, and seeing how close he was to the Bacas' home, responded to the call. He testified that he learned the following information while he was driving

to the Bacas' home: (1) that the 911 call concerned a domestic "behavioral issue"; (2) that Ms. Baca had a history of behavioral issues; (3) that Ms. Baca had threatened to kill the caller; (4) that the caller had barricaded herself and a child in a bedroom; (5) that Ms. Baca had been making stabbing motions at the floor with a knife; (6) that during the call, the caller had gone silent; and (7) that the 911 operator had at some point heard a child crying in the background. As he arrived on the Bacas' street, he saw two women walking toward the Bacas' home, but he was unsure if they entered it.

Officer Cosper parked outside the Bacas' home with his body camera activated, which captured video-audio recording of his entire interaction with Ms. Baca. As we understand it, the Bacas' home housed Ms. Baca and some other family members. The home was one-half of an A-frame duplex. The Bacas' part of the duplex that faced the street had an open, covered structure outside the front window, which contained, among other things, two religious statues, live greenery, and small pieces of hanging laundry. The structure extended about eight feet into the driveway with a tarp as its left side. So as Officer Cosper approached the Bacas' residence, he walked up the driveway and down the tarp-lined path toward the front door positioned on the side of the house. He says that as he walked up her driveway, he "hear[d] the sound of metal tinging as if a piece of metal was being struck several times in succession

3

against a metal or ceramic surface." Amend. Supp. App. at 16 ¶ 26; *see* Media

Ex. A at 1:11–1:13. Here's Officer Cosper's view from his body camera:



Media Ex. A at 1:11. As he walked past the outside of the duplex building

itself, Officer Cosper arrived at the residence's "front" door on his right and

saw into the living room through the screen door. Again, the view from Officer

Cosper's body camera best sets the scene:



*Id.* at 1:18. Peering through the screen door, he saw two women standing beside Ms. Baca in the living room and talking calmly with her. By then, he had already unholstered his firearm and was holding it down along his right-hand side.

Officer Cosper announced himself in an ordinary tone and told the two women to step outside. As they passed by him, the first woman said something to Officer Cosper that he didn't hear clearly, and the second said to him, "Please be very careful with her." *Id.* at 1:24–1:26. Now alone in the living room, Ms. Baca came more fully into Officer Cosper's view. Ms. Baca stood stationary about ten feet from Officer Cosper. *Baca v. Cosper*, No. 2:22-CV-00552-RB-GJF, 2023 WL 5725427, at *2 (D.N.M. Sept. 5, 2023). In each hand, Ms. Baca held a knife pointed toward the floor.

After Officer Cosper saw Ms. Baca, the calm scene he encountered ended. Officer Cosper immediately pointed his firearm at Ms. Baca and began yelling at her to drop the knives. The flashlight attached to Officer Cosper's firearm was turned on, shining light on Ms. Baca's chest and face. The women who had left the house hovered nearby and became frantic at the deteriorating situation. One of the women stressed to him that Ms. Baca "was mentally sick" to which Officer Cosper responded, "Okay." Media Ex. A 1:26–1:37. Officer Cosper continued to yell at Ms. Baca to drop the knives. *E.g.*, *id.* at 1:41–1:43 ("Drop the fucking knife!"), 2:04–2:05 ("Put the fucking knife down!"). After being told that Ms. Baca was "mentally sick," Officer Cosper yelled at the two frantic women to back away, while keeping his eyes and firearm on Ms. Baca.

About then another Las Cruces police officer, Officer Fierro, arrived and moved the two women out past the tarp-lined entryway and into the open driveway. That left Officer Cosper an unobstructed retreat to the same area.

About thirty seconds after Officer Cosper started yelling at Ms. Baca, she moved the knife in her left hand to her right hand, so that both knives were in her right hand. Amid the now-intense scene, Ms. Baca lifted her right arm toward the inside of the house, removing the knives from Officer Cosper's view, and then turned her head that way too. While keeping her right arm extended, she turned back to Officer Cosper, raised her empty left hand to shoulder level toward him and pointed her hand toward the floor, and then lowered her head. Throughout the encounter, Ms. Baca was speaking to Officer

6

Cosper, but he later reported in a declaration he submitted once the litigation began, that he was unable to tell what language she was speaking.

Officer Cosper continued to yell at her to put the knives down, and Ms. Baca lowered her right arm so the knives in her hand were again pointing to the floor and visible to him. After this, she made eye contact with Officer Cosper, and with the two knives in her right hand still pointing at the floor, she tilted her head back some and took two slow steps toward Officer Cosper. As her foot landed on the second step, when she was about six feet from Officer Cosper, he shot her twice in the chest, and she fell to the floor. As her face lay in the collecting pool of blood, Officer Cosper ordered another officer to pull her out into the pathway and handcuff her. Only 45 seconds elapsed from Officer Cosper's arriving at her doorway to his firing the fatal shots.

## II.    Procedural Background

Ms. Baca's estate filed a complaint in federal court against Officer Cosper, Miguel Dominguez (Las Cruces's chief of police), and the City of Las Cruces.[1] Complaint, *Baca v. Cosper*, No. 2:22-CV-00552-RB-GJF (D.N.M. July 25, 2022), ECF No. 1. The Estate sued Officer Cosper for using excessive force

---

[1] The complaint is not in the record, but we can take judicial notice of publicly filed court records. *See United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

in violation of the Fourth Amendment.[2] It also brought a claim of supervisory liability against Chief Dominguez and a claim of municipal liability against Las Cruces based on Officer Cosper's allegedly unconstitutional conduct.

The district court concluded that Officer Cosper was entitled to qualified immunity and thus granted him summary judgment. *Baca*, 2023 WL 5725427, at *14. Given that ruling, the parties agreed that Chief Dominguez and Las Cruces's joint motion for summary judgment was moot because the claims against those defendants depended on the excessive-force claim against Officer Cosper. So the parties also agreed that the order granting Officer Cosper summary judgment "resolved this matter so that entry of a final and appealable judgment is proper." Amend. Supp. App. at 70. The Estate timely appealed the order.

## DISCUSSION

We review de novo a district court's grant of summary judgment. *Sanchez v. Guzman*, 105 F.4th 1285, 1292 (10th Cir. 2024). In doing so, we view the evidence in the light most favorable to the Estate and draw all reasonable inferences in its favor as the non-moving party at summary judgment. *Tolan v. Cotton*, 572 U.S. 650, 656–67 (2014). But we accept facts clearly depicted in the officers' body camera video footage if they dispel any

---

[2] The Estate also brought a deprivation-of-life-without-due-process claim under the Fourteenth Amendment but abandoned that claim at summary judgment. *Baca*, 2023 WL 5725427, at *5, *14. So the only claim against Officer Cosper is the excessive-force claim under the Fourth Amendment.

genuine dispute about those facts. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007). If the recording does not clearly depict an action, and the evidence can reasonably be interpreted to support either party's version of what happened, then we must take the Estate's version of what happened. *See id.*

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (internal quotation marks omitted). To satisfy that burden, the Estate must show that (1) Officer Cosper's alleged conduct violated Ms. Baca's constitutional rights, and (2) that Supreme Court or published Tenth Circuit cases, or the weight of authority from other courts, existing at the time of the violation, clearly established that such conduct constituted a violation of that right. *See Sanchez*, 105 F.4th at 1292; *Flores v. Henderson*, 101 F.4th 1185, 1197 (10th Cir. 2024). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam).

### A. The Constitutional Violation

The Estate asserts that Officer Cosper violated Ms. Baca's Fourth Amendment right to be free from excessive force by fatally shooting her when she posed no immediate threat of serious bodily injury or death to Officer Cosper or others. "We review Fourth Amendment claims of excessive force

9

under a standard of objective reasonableness, judged from the perspective of a reasonable officer on the scene." *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015); *accord Graham v. Connor*, 490 U.S. 386, 396–97 (1989). "The reasonableness of an officer's actions depends both on whether the officers were in danger at the precise moment that they used force and on whether the officer's own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Tenorio*, 802 F.3d at 1164 (cleaned up); *Arnold v. City of Olathe*, 35 F.4th 778, 790 (10th Cir. 2022) (noting that "binding Tenth Circuit precedent requires us to consider whether the officers' alleged reckless conduct created the need to use deadly force").

In considering whether force was reasonable, we look to three non-dispositive factors, known as the *Graham* factors: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or trying to flee. *Graham*, 490 U.S. at 396. In a deadly-force case, we also consider whether the officer had "probable cause to believe that there is a *threat of serious physical harm to the officer* or to others." *Tenorio*, 802 F.3d at 1164 (quoting *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)) (alterations accepted).

To determine whether a reasonable officer would have probable cause to believe the suspect presented an immediate threat of serious physical harm, we are guided by four nonexclusive sub-factors, known as the *Larsen* factors:

10

(1) "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands"; (2) "whether any hostile motions were made with the weapon towards the officers"; (3) "the distance separating the officers and the suspect"; and (4) "the manifest intentions of the suspect." *Larsen*, 511 F.3d at 1260. But those are only guides in determining "whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Tenorio*, 802 F.3d at 1164 (quoting *Larsen*, 511 F.3d at 1260).

Here, addressing the first *Graham* factor, we agree with the district court that the reported crime was a serious one—the 911 caller stated that Ms. Baca had knives and had threatened to kill her and her daughter. *Baca*, 2023 WL 5725427, at *7; *see* N.M. Stat. Ann. § 30-3-2 (2024) (noting aggravated assault is a felony); *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023) ("When the crime at issue is a felony . . . the crime is considered to have a high degree of severity which weighs against the plaintiff."). So that factor weighs against the Estate. We also agree with the district court that the third *Graham* factor favors the Estate because Ms. Baca was not trying to resist arrest or flee. *Baca*, 2023 WL 5725427, at *7.

That leaves us with what we've termed the "most important" *Graham* factor. *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 763 (10th Cir. 2021) (cleaned up). In a deadly-force case, that factor asks whether Ms. Baca posed an immediate threat of serious physical harm to Officer Cosper or others. *See*

11

*id.* That means Officer Cosper's use of deadly force was unreasonable unless at the instant he fired his shots, a reasonable officer on the scene would have believed that Ms. Baca posed an immediate threat of serious physical harm to himself or others. *See Larsen*, 511 F.3d at 1260.

And our case law answers that question. We have held that it is unreasonable for an officer to use deadly force where the "officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him." *Tenorio*, 802 F.3d at 1165–66 (quoting *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006)); *accord Zuchel v. City & Cnty. of Denver*, 997 F.2d 730, 735–36 (10th Cir. 1993). Here, it is undisputed that Ms. Baca was holding only knives and that she made no slicing or stabbing motions toward Officer Cosper.[3] And we agree with the district court that a jury could conclude

---

[3] Officer Cosper concedes that "[t]echnically, [Ms. Baca] did not make a 'hostile motion with the weapon'" because "she did not bring her right arm up into a position from which she could immediately execute a slicing, stabbing, or thrusting motion at [Officer Cosper] with the knives." App. vol. I, at 32. Despite that concession, he argues a reasonable officer "could construe" her stepping toward him to be "a hostile motion." *Id.* That may be so. But we agree with the district court that a jury could also find that a reasonable officer could construe her stepping toward him as a *non*-hostile motion. *Baca*, 2023 WL 5725427, at *9. And that's what matters at summary judgment.

that Ms. Baca was not charging Officer Cosper.[4] *Baca*, 2023 WL 5725427, at *9.

Because a jury could find that Ms. Baca was holding only a knife, was not charging Officer Cosper, and made no slicing or stabbing motions toward him, we conclude that the district court erred by granting summary judgment against the Estate. We now turn to the district court's conclusion that Officer Cosper's conduct did not violate clearly established law.

## B.    Clearly Established Law

Though we have determined that a reasonable jury could find that Officer Cosper's shooting of Ms. Baca violated the Fourth Amendment, Officer Cosper is still entitled to qualified immunity unless the Estate shows that the violation was clearly established at the time of the shooting. *See Sanchez*, 105 F.4th at 1292. Though we don't require a "scavenger hunt for a prior case with identical facts," *id.* at 1292–93 (internal quotation marks omitted), we consider a case on point "if it involves materially similar conduct or applies with obvious clarity

---

[4] Though the district court agreed with the Estate that a reasonable jury could construe Ms. Baca's actions as an attempt to comply, it reasoned that Officer Cosper was entitled to summary judgment because the Estate "fail[ed] to demonstrate a factual dispute regarding [Officer] Cosper's *impression* of [Ms.] Baca's conduct." *Baca*, 2023 WL 5725427, at *9. Though an officer can use deadly force even under a mistaken belief that a person poses an immediate threat of serious physical harm to the officer or others, that mistaken belief must still be an *objectively* reasonable one. *Larsen*, 511 F.3d at 1260. In other words, it doesn't matter what Officer Cosper's subjective impressions were; it matters only whether a reasonable jury could find that a reasonable officer in Officer Cosper's position could think Ms. Baca posed an immediate threat to himself or others. *See id.*

13

to the conduct at issue," *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017). Similarity between the cases is "especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12 (cleaned up).

With those requirements in mind, we rely on the same clearly established law as *Tenorio* did, as well as the clearly established law announced in *Tenorio* itself.[5] 802 F.3d at 1165–66. In *Tenorio*, we interpreted two of our decisions—

---

[5] Though the Estate did not cite *Tenorio* before the district court, Officer Cosper spent pages of his summary-judgment opening brief arguing against its application. The district court noted that the Estate had not addressed *Tenorio*, and otherwise did not comment on it. *Baca*, 2023 WL 5725427, at *9 n.11. On appeal, the Estate has not addressed *Tenorio*. But more broadly, the Estate has always maintained that Officer Cosper violated the Fourth Amendment by using deadly force when Ms. Baca presented no threat of serious bodily injury or death to others.

"When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 99 (1991). Though we are restricted from "*raising* new issues," once a party raises an issue, we are not required to "render [our] decision in accordance with the position of one of the parties." *United States v. Cortez-Nieto*, 43 F.4th 1034, 1052 (10th Cir. 2022).

And in qualified immunity cases, the Supreme Court has instructed a reviewing court to "use its full knowledge of its own and other relevant precedents." *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (cleaned up). That's so because "[w]hether an asserted federal right was clearly established at a particular time . . . presents a question of law, not one of 'legal facts.'" *Id.* We've applied *Elder* in our circuit, explaining that "[w]hile it is true that Plaintiffs should cite to what constitutes clearly established law, we are not

(*footnote continued*)

14

*Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006) and *Zuchel v. City & Cnty. of Denver*, 997 F.2d 730 (10th Cir. 1993)—as clearly establishing "that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect." *Id.* (quoting *Walker*, 451 F.3d at 1160); *accord Zuchel*, 997 F.2d at 735–36.

In *Tenorio*, police were called to the home of a man (Russell Tenorio) who was intoxicated, waving a knife around, holding a knife to his own throat, and threatening self-harm. 802 F.3d at 1161–62. The 911 caller said she was afraid Tenorio was going to hurt himself or his wife. *Id.* at 1162. The dispatcher told the responding officers that Tenorio had a history of violence

---

restricted to the cases cited by them." *Cortez v. McCauley*, 478 F.3d 1108, 1122 n.19 (10th Cir. 2007) (en banc); *accord Williams v. Hansen*, 5 F.4th 1129, 1132–33 (10th Cir. 2021) ("In determining whether a right is clearly established, we are conducting de novo review of a legal issue, which requires consideration of all relevant case law."). And our sister circuits have similarly applied *Elder*. *E.g.*, *Joseph on Behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 337–38, 338 n.78 (5th Cir. 2020) (identifying clearly established law not cited by the plaintiff, reasoning that though "[i]nadequate briefing can cause parties to forfeit claims and arguments . . . we must apply settled case law"); *Golodner v. Berliner*, 770 F.3d 196, 205 (2d Cir. 2014) (conducting a clearly established law analysis despite neither party addressing the analysis "in any helpful way"); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994) (describing plaintiff's concession that she failed to find an on-point case for the clearly established law prong of the analysis as a deficiency that was "not fatal by itself because we must determine qualified immunity in light of all relevant precedents—both those cited by the parties and those we discover ourselves").

So we conduct our clearly established analysis with full knowledge of settled case law.

and that other family members, including the caller, were inside the home. *Id.* When the officers arrived, they were met in the front yard by the 911 caller, who was still speaking to the dispatcher and appeared frightened. *Id.* After speaking briefly with her, the officers walked through the front door and into the living room, which was about 14 feet by 16 feet. *Id.* The officers heard no raised voices or other sounds that suggested a disturbance. *Id.*

Tenorio, his wife, and another man were inside the kitchen, which was partially visible from the living room where the officers were standing. *Id.* at 1162–63. As the officers entered the living room, one officer said, "Please step out here." *Id.* at 1162. Tenorio's wife stepped out of the kitchen first and said, "Russell, put that down." *Id.* Tenorio followed her out of the kitchen, and the other man in the kitchen followed him. *Id.* at 1163. An officer assisted Tenorio's wife from the house. *Id.* When Tenorio appeared to the officers, he had a blank stare on his face and was holding a santoku-style kitchen knife with a three-and-a-quarter-inch blade. *Id.* "He was holding the knife loosely in his right hand, his arm hanging by his side . . . ." *Id.* As Tenorio entered the living room, he kept walking at an unbroken "average speed." *Id.* (internal quotation marks omitted). The lead officer saw the knife in his hand and yelled at him four times in rapid succession to put the knife down. *Id.* But Tenorio continued another two and one-half steps into the 14-by-16-foot living room without dropping the knife. *Id.* at 1162–63. With the doorway congested with law-

enforcement officers, the lead officer shot him and another officer tased him, causing nonfatal but life-threatening injuries. *Id.* at 1163.

On those facts, we affirmed the denial of summary judgment because Tenorio had made no aggressive move or hostile action toward the officer (*i.e.*, the suspect was holding only a knife, was not charging, and was not making slicing or stabbing motions toward the officer), meaning that *Zuchel* and *Walker* compelled our conclusion that the officer's use of deadly force violated clearly established law. *See id.* at 1165–66.

*Tenorio*, *Zuchel*, and *Walker* compel the same result in this case. Ms. Baca was not charging Officer Cosper and made no slicing or stabbing motions toward him. *See id.*; *Walker*, 451 F.3d at 1160; *Zuchel*, 997 F.2d at 735–36. So it was clearly established that Officer Cosper's use of deadly force against Ms. Baca was unreasonable.

Before we conclude, we note that the district court's analysis credited Officer Cosper's argument that he had no realistic option to retreat because if he stepped to his right, he'd lose sight of Ms. Baca and put the other people in the home at risk. *Baca*, 2023 WL 5725427, at *12–13. This overstates the risks that Officer Cosper faced. If Ms. Baca moved toward him, he could step to his right and back down the pathway and into the driveway. If she followed, she would pose no risk to the people inside the home and Officer Cosper would not lose sight of her. Indeed, he would lead her down the driveway, where another officer with a taser would be waiting. If she did not follow him, he would still

17

have an angle to see whether she crossed the room toward the area of the house in which the daughter and granddaughter were barricaded in the bedroom. And Officer Cosper wasn't without additional backup; less than three minutes after the shooting, there were at least six additional police cruisers at the Bacas' home. He or other officers could then intervene with less-than-lethal force while outside her knife-striking distance.[6] So we are not persuaded that Officer Cosper was as confined as he represents himself to be, nor do we think that fact distinguishes his case away from clearly established law. *See Tenorio*, 802 F.3d at 1165–66; *Walker*, 451 F.3d at 1160; *Zuchel*, 997 F.2d at 735–36.

Taking the facts in the light most favorable to the Estate, a reasonable jury could conclude that Officer Cosper violated Ms. Baca's clearly established constitutional rights by shooting her. As a result, we conclude the district court erred in finding Officer Cosper was entitled to summary judgment based on qualified immunity.

---

[6] The district court credited Officer Cosper's impression that if he lost sight of Ms. Baca, she would have posed a danger to the barricaded daughter and granddaughter and to the bystanders in the driveway. *See Baca*, 2023 WL 5725427, at *5, *8, *12. But in assessing risk to others, the district court failed to weigh the counter risk to the barricaded family members and the adjoining-duplex residents from Officer Cosper firing two shots into the residence. And common sense has a place here too. The asserted danger to the barricaded family members ignores that Ms. Baca was a 75-year-old woman of diminished mental capacity armed with two knives with no explained ability to break down a barricaded bedroom door. And any risk to the bystanders in the driveway, who were standing with a second officer, is an even greater stretch.

**CONCLUSION**

For the reasons stated, we reverse the district court's decision to grant Officer Cosper summary judgment on the § 1983 excessive-force claim. The case is remanded for further proceedings consistent with this opinion.