**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**August 6, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

BENJAMIN JOSEPH HEROLD,

    Plaintiff – Appellant,

v.

MICHAEL CHRISTENSEN, Sergeant; ST. GEORGE CITY,

    Defendants – Appellees,

and

PACE TRUMAN; GAGE GARDINER; DOES JOHN AND JANE, 1-10,

    Defendants.

No. 23-4075
(D.C. No. 4:20-CV-00140-DN)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **MORITZ**, and **EID**, Circuit Judges.
_____

Benjamin Joseph Herold, who suffers from mental illness, lost his right eye after he was shot in the face with pepper spray during an encounter with three St. George, Utah police officers in March 2019. Herold sued Sergeant Michael Christensen (the officer who pepper-sprayed him) and the City of St. George,

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

alleging—as relevant here—that Christensen's conduct constituted excessive force in violation of the Fourth Amendment and the Utah Constitution. Christensen and the City moved for summary judgment, arguing that Christensen is entitled to qualified immunity as to Herold's Fourth Amendment claim and that Herold's related state-law claim fails as a matter of law because the applicable law was not clearly established at the time of the incident. The district court granted summary judgment on both grounds.

Herold appeals, arguing that Christensen is not entitled to qualified immunity because Christensen's conduct was an obvious and flagrant violation of Herold's constitutional rights. We hold that Christensen's conduct did not violate clearly established law and that Herold has waived his argument that the constitutional violation was otherwise obvious. We also hold that because the law was not clearly established, Herold's state-law claim necessarily fails, too. Accordingly, we affirm.

## I.

On March 13, 2019, the St. George, Utah Police Department received a call from Emily Tomer, asking officers to respond to an escalated encounter between her brother, Benjamin Joseph Herold, and their mother, Cheryl Herold. At the time, Herold was living with his mother in St. George. Tomer informed the police that she had received a voice message from her mother in which she could hear Herold yelling, and that when she called her mother back, her mother asked her to "call for help." App'x Vol. I at 181–82. Tomer also explained to the police that Herold was "mentally ill." *Id.* at 182. She asked for officers and mental health professionals to

2

go to her mother's house so that Herold could be "checked in [to a mental health facility]." *Id.* at 181.

Three St. George police officers went to the Herolds' residence, arriving shortly after 10:00 P.M. Officer Pace Truman was the first on scene, followed separately by Officer Gage Gardiner, and then Sergeant Michael Christensen. Truman and Gardner, each wearing activated body cameras, first made contact with Herold and notified Christensen by dispatch that they were "fine at that point." *Id.* at 182. When Christensen arrived, he encountered Truman and Gardiner talking with Herold in the garage.

The officers told Herold that he was alarming his mother and that she thought he "need[ed] to be on [his] meds." *Id.* at 183. Herold responded that he had "already taken [his] meds," which had made him "a little bit loopy." *Id.* Herold's mother then entered the garage and told the officers that Herold had destroyed a filing cabinet in the garage by hitting it with a hatchet. At that point, Herold and his mother briefly discussed whether or not the filing cabinet actually belonged to Herold, and Herold told the officers that he had hit the filing cabinet because it belonged to him. Because this situation was agitating Herold, the officers had his mother go back in the house.

The officers then continued speaking with Herold, who told them that he had suffered a head injury after a car accident and now had to "retrain [his] anger in [his] mind." *Id.* at 184. After speaking with the officers for several minutes, Herold stated that he was going to go back inside and walked toward the door to the house. One of

3

the officers intercepted him, telling him, "Stay here.  Stay here. . . . You're not going inside." *Id*.  In response, Herold pivoted toward a fridge in the garage, opened it, and took out a twelve-pack box of sodas.  Christensen told Herold to "[s]tay out of the fridge." *Id.* at 185.  Herold turned to face Christensen and said, "Do not push me." *Id.*  As Herold continued to reach inside the box of sodas and took out a can, Christensen told him he was being "detained" and touched Herold's hand.  *Id.* Herold yelled, "Detain me officer, here you go!," pushed Christensen's hand away, and threw the soda can across the garage.  *Id.*

Christensen then told Herold that he was under arrest, and Herold placed his hands behind his back, yelling, "Good! I'm under arrest, mom!" and "F*** you!"  *Id.* Herold—who had previously informed Truman and Gardiner, but not Christensen, that he had two torn rotator cuffs—also told the officers that if they did "anything to [his] shoulders," he would have their "f***ing badges on [his] desk in the f***ing morning." *Id.*  Once Herold placed his hands behind his back, his body became rigid, his fists balled up, and he turned his body toward the officers.

At that point, Christensen—who was about the same size and build as Herold—took Herold to the floor.  Herold, laying on his back, resisted being placed in handcuffs and repeatedly swore at the officers.  Christensen warned Herold three times that if he continued to struggle with the officers, Christensen would "shoot [him] in the face" with pepper spray.  *Id.* at 186.  In response, Herold told Christensen to "[g]o for it" and said, "I dare you to, son of a b*tch."  *Id.*  He also

4

yelled, "I said don't f***ing touch me." *Id.* at 187. Eventually, Herold pulled out of the officers' grasp, quickly moving his arm toward Christensen's upper body.

Christensen then deployed his pepper-spray gun, shooting Herold from approximately three feet away—less than the five-foot recommended minimum range listed in the instructions for that particular pepper-spray gun—and hitting him in the right eye. After Christensen deployed his pepper-spray gun, the officers were able to handcuff Herold. Gardiner then immediately radioed for medical attention for Herold's eye, while Christensen retrieved water to wash Herold's eye and face. Herold was transported to the hospital and treated, but he ultimately lost his right eye due to the damage caused by the pepper spray.

Herold was later charged with several counts related to his conduct during the incident: three counts of assault against a peace officer, one count of interference with an arresting officer, and one count of criminal mischief (domestic violence).[1] Herold pleaded no contest to two of the assault charges and the interference charge; in doing so, Herold admitted that "he knowingly and intentionally assaulted at least two peace officers." *Id.* at 189; Supp App'x at 103.

Additionally, at the time of the incident, Christensen had received training and was certified in the use of pepper-spray guns via a course approved by the

---

[1] The three counts of assault were each charged as Class A misdemeanors under Utah law, while the interference and criminal mischief counts were charged as Class B misdemeanors. *See* Supp. App'x at 95–96; Utah Code Ann. §§ 76-5-102.4(2)(a), 76-8-305, 76-6-106(2)(C). Under Utah law, a Class A misdemeanor is the most serious misdemeanor category. *See* Utah Code Ann. § 76-3-204.

manufacturer of the product. Still, Christensen later admitted that his conduct violated St. George Police Department policy, which prohibits the discharge of a pepper-spray gun at anyone's face or eyes closer than five feet unless deadly force is authorized. The incident was the St. George Police Department's first and only field encounter involving the deployment of a pepper-spray gun. Since the incident, the St. George Police Department has completely stopped using pepper-spray guns.

Herold eventually sued Christensen and the City of St. George,[2] bringing seven claims, including—as relevant here—two separate excessive-force claims arising under the Fourth Amendment and the Utah Constitution. Christensen and the City moved for summary judgment as to all of Herold's claims, which the district court granted in full. As relevant here, the district court concluded that Christensen was entitled to qualified immunity with respect to Herold's Fourth Amendment claim because, although Christensen's conduct constituted excessive force in violation of the Fourth Amendment, the law was not clearly established at the time of the incident. The district court also concluded that Herold's state-law claim failed because that claim—like qualified immunity—requires that the law prohibiting Christensen's conduct must have been clearly established.

Herold appealed, arguing that Christensen is not entitled to qualified immunity—and that his state-law claim should be allowed to proceed—because the law prohibiting Christensen's conduct was clearly established (or, alternatively,

---

[2] Herold originally named Truman and Gardiner as defendants but later moved to voluntarily dismiss them from all claims. *See* App'x Vol. I at 8–9.

6

because Christensen's conduct was an "obvious" violation of Herold's constitutional rights).

## II.

We begin by addressing whether Christensen is entitled to qualified immunity from Herold's Fourth Amendment excessive-force claim. "We review a district court's grant of summary judgment based on qualified immunity de novo," applying the same standard as the district court. *Waterhouse v. Direzza*, 129 F.4th 1212, 1220 (10th Cir. 2025) (quoting *Sanchez v. Guzman*, 105 F.4th 1285, 1292 (10th Cir. 2024)). Under that standard, "[w]e view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Id.* (quoting *Flores v. Henderson*, 101 F.4th 1185, 1192 (10th Cir. 2024)).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted). The "affirmative defense" of qualified immunity "creates a presumption that the defendant is immune from suit." *Waterhouse*, 129 F.4th at 1220 (quoting *Sanchez*, 105 F.4th at 1292). Because of that presumption, "our review at the summary-judgment stage is somewhat modified when a defendant asserts a qualified-immunity defense." *Id.* Specifically, when a defendant "asserts qualified immunity at the summary judgment stage, 'the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established.'"

7

*Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020) (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)).

We may address these two prongs "in either order." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017). In this case, however, the first prong of qualified immunity is not at issue: the district court concluded that Christensen's conduct constituted excessive force in violation of Herold's Fourth Amendment rights, and the parties do not challenge that conclusion on appeal. Thus, we need only determine whether it was clearly established at the time of the incident that Christensen's conduct—both his initial takedown of Herold and his act of shooting Herold with pepper spray at a close range—was unconstitutional.

The law is clearly established for purposes of qualified immunity if either the Supreme Court or this Circuit has "previously ruled that materially similar conduct was unconstitutional." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008). Although past cases need not involve "precisely the same facts," *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007), "the clearly established law must be 'particularized' to the facts of the case," *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The "salient question is whether the state of the law at the time of [the] incident provided fair warning to [Christensen] that [his] alleged conduct was unconstitutional." *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)) (cleaned up).

8

To a similar end, we must not "abstract[] [our past] holdings to the situation here" too much. *Id.* at 1174. Doing so may "define the qualified immunity inquiry at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 13 (2021). And "specificity is 'especially important in the Fourth Amendment context,' where it is 'sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id.* at 13–14 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).

## A.

Before us, Herold largely abandons his position that the law was clearly established through materially similar Tenth Circuit or Supreme Court precedent, conceding in his opening brief that "[t]here are no factually precise Tenth Circuit or Supreme Court cases that address the *exact conduct or force* in this case." Aplt. Br. at 18 (emphasis in original); *see id.* at 22, 24.[3] But Herold's concession aside, we must analyze the clearly established law prong in light of all relevant precedents—whether argued by the parties or not. *See Baca v. Cosper*, 128 F.4th 1319, 1327 n.5 (10th Cir. 2025); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994) (stating that a plaintiff's concession that she was "unable to locate any case directly on point" was "not fatal by itself" to the clearly established prong "because we must determine

---

[3] Additionally, at oral argument, Herold expressly stated that he was abandoning any argument that the law was clearly established by a materially similar case. Oral Argument at 12:47–57 (conceding that "there is no specific case that we found where someone's shot in the eye with a pepper gun" and agreeing with the panel that he is "not making the argument that [the asserted constitutional violation] was clearly established").

9

qualified immunity in light of all relevant precedents—both those cited by the parties and those we discover ourselves"); *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (cautioning that, in the qualified immunity context, an appellate court should use its "full knowledge of its own [and other relevant] precedents" to determine if a defendant's conduct violated clearly established law (quoting *Davis v. Scherer*, 468 U.S. 183, 192 n.9 (1984))).[4]

We conclude that the law was not clearly established at the time of Christensen's conduct. Although Herold cites a number of our past cases throughout his briefing, each is materially distinguishable from the facts of this case because they all involved suspects who put up no resistance, posed no threat to the safety of officers, themselves, or others, or had already been subdued.

Consider first *McWilliams v. DiNapoli*, 40 F.4th 1118 (10th Cir. 2022)—the only case Herold relied on at the district court.[5] *McWilliams* involved a confrontation

---

[4] We have occasionally declined to consider arguments bearing on the clearly established law prong when a party expressly concedes or abandons the issue during oral argument. *See, e.g.*, *Cummings v. Dean*, 913 F.3d 1227, 1243 n.4 (10th Cir. 2019). But we are not bound by Herold's concession. *See Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 754 n.4 (10th Cir. 2024). So long as the issue is properly before us, we are "not limited to the particular legal theories advanced by the parties, but rather retain[] the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 99 (1991). And we consider this issue to be properly before us because both parties raised and briefed it at the district court, and the district court expressly ruled on the issue itself, holding that the law was not clearly established through materially similar Tenth Circuit or Supreme Court precedent.

[5] We note that *McWilliams* was decided in 2022—three years after Herold's March 2019 encounter with the St. George Police Department—and therefore cannot serve as a materially similar case for purposes of determining whether the law was clearly established at the time of the incident at issue here. *See Est. of Smart*,

that began when a man, Greg McWilliams, initially refused to leave a marina after management and a police officer each asked him to do so. *Id.* at 1122. But just as McWilliams finally began to acquiesce, the officer "grabbed or hit a cigarette" out of McWilliams's hand. *Id.* In response, McWilliams yelled and gestured at the officer and began to approach him. *Id.* The officer told McWilliams to get back and then tilted his head down, hitting McWilliams's nose with his hat; the officer also began punching McWilliams, tackled him, and put him in a chokehold. *Id.* We held that the officer was not entitled to qualified immunity because his use of force violated clearly established law—namely, that "officers must give a warning or a chance to submit to arrest before using violent force against suspected misdemeanants who are not violent, aggressive, or fleeing." *Id.* at 1130.

Several facts distinguish this case from *McWilliams*. Unlike McWilliams—who had finally acquiesced in the officer's requests, had not clearly touched the officer or even moved his arms, and did not threaten, provoke, or resist the officer, *see id.* at 1122–24, 1126—here, Herold was continuing to resist Christensen's attempts to detain him, exhibited aggressive behavior (including by throwing a soda can and waving his left arm around), and verbally provoked all three officers by cursing and yelling at them. And unlike the officer in *McWilliams*, Christensen did nothing to provoke Herold's agitation, other than briefly touching his hand once after telling Herold he was being detained and ordering Herold to stay in the garage and

---

951 F.3d at 1176 n.14. In any event, as we explain below, *McWilliams* is distinguishable from this case in several respects.

out of the fridge. Moreover, Christensen expressly warned Herold that if he continued to resist, Christensen would shoot him in the face with pepper spray—and Herold responded by daring Christensen to "[g]o for it." App'x Vol. I at 186. Those facts materially distinguish this case from *McWilliams*, such that *McWilliams* did not clearly establish that Christensen's conduct would violate the Fourth Amendment.

Many of those same factual differences also distinguish Herold's case from the other decisions he cites—almost all of which dealt with suspects who did not resist or pose a threat to officers. For instance, our decision in *Morris v. Noe* involved an encounter in which officers threw a suspected misdemeanant to the ground without warning after he backed toward them with his hands up in a defensive position, "attempt[ing] to deescalate the encounter." 672 F.3d 1185, 1190, 1196 (10th Cir. 2012). We held that the officers' forceful takedown was unconstitutional because the suspect posed no threat, exhibited no signs of violence, and put up no resistance to officers. *Id.* at 1197–98. Four years after *Morris*, we held in *Davis v. Clifford* that officers conducting a traffic stop violated clearly established law by using a "disturbing" degree of force by shattering the suspect's car window, grabbing her by her hair and arms, pulling her through the window, and pinning her on broken glass, even though the suspect exhibited no active resistance or aggression. 825 F.3d 1131, 1133–37 (10th Cir. 2016).[6]

---

[6] Similarly, our decision in *Jordan v. Jenkins* involved a police encounter that occurred when officers forcibly threw a man to the ground and arrested him after the man criticized and mocked the officers while they questioned his nephew about a car accident. 73 F.4th 1162, 1165–67 (10th Cir. 2023). Relying on *Morris*, we held that

But here, as explained, Herold *did* resist the officers' commands and their attempts to detain him. For instance, when Christensen told Herold to "[s]tay out of the fridge," Herold did not comply, instead continuing to grab a soda can. App'x Vol. I at 184. When Christensen then told Herold he was being "detained" and reached toward him, Herold pushed Christensen's hand away and threw the soda can across the garage. And once Christensen had taken Herold to the ground, Herold continued to struggle, eventually pulling out of the officers' grasp and jerking his arm toward Christensen.[7] Moreover, as explained, Herold verbally provoked and

---

the officers' conduct violated clearly established law—namely, that "a takedown maneuver is unconstitutional when the arrestee poses no threat, puts up no resistance, and does not attempt to flee." *Id.* at 1174. *Jordan* is distinguishable from this case on the facts, but it also cannot serve as a basis for clearly established law because it was decided four years after the incident at issue here. *See supra* footnote 4.

[7] The dissent emphasizes that although Christensen had also repeatedly told Herold to roll onto his stomach, Herold was unable to comply with that order because of his position on the floor, under the officers, and against a wall of boxes and shelving. *See* Dissent at 5,7 & n.6, 10. It is true, as the dissent suggests, that Herold's non-compliance with that particular order could not alone justify Christensen's use of force. But that order was just one of many that Herold disobeyed. It is undisputed that Christensen and the other officers had told Herold to stay in the garage, out of the house, and out of the garage fridge. And it is also undisputed that, once Herold began yelling, cursing, and making sudden movements toward officers, the officers then asked Herold to "calm down" and told him to "stop" several times. Only after ordering Herold to stop fighting back—but before telling him to roll on his stomach—did Christensen then warn Herold that he would "shoot [Herold] in the face." Media Ex. 113-3 at 20:30–33; *id.* at 20:52–55; App'x Vol. I at 186.

But Herold did not comply with *any* of those orders—even though nothing suggests he was unable to. Instead, he told Christensen to "go for it" and shoot him with the pepper spray, saying, "I dare you to, son of a b*tch." Media Ex. 113-3 at 20:32–37; App'x Vol. I at 186. And Herold continued to fight and resist, eventually pulling out of the officers' grasp and swinging his arm toward Christensen. Media Ex. 113-4 at 17:42–46; App'x Vol. I at 186. In that way, it is undisputed that Herold

13

threatened the officers throughout the encounter—he repeatedly yelled, cursed, and eventually "dare[d]" Christensen to shoot him with pepper spray. *Id.* at 185–87. Herold's physical resistance and verbal aggression thus made him more threatening to the officers than the suspects in *Morris* or *Davis*, such that neither case "provided fair warning to [Christensen] that [his] alleged conduct was unconstitutional." *Est. of Smart*, 951 F.3d at 1168 (cleaned up).

To be sure, we have also held that a suspect's resistance does not *always* justify forceful takedown maneuvers, particularly where the suspect exhibits only minor resistance. *See Surat*, 52 F.4th at 1277. In *Surat*, we held that an officer's takedown of a suspect who had attempted to pry the officer's fingers off her and pawed at the officer's arm constituted excessive force, notwithstanding the suspect's "minimal resistance." *Id.* at 1267, 1275–76. But we also held that the unconstitutionality of the forceful takedown was not clearly established under *Morris*, which only addressed takedowns occurring when there is no resistance at all. *Id.* at 1277–80. *Surat* was decided in November 2022, more than three years after Herold's March 2019 encounter with Christensen and the St. George Police Department—meaning that, at the time of the incident here, it was only clearly established that a takedown maneuver is unconstitutional when the suspect exhibits no resistance whatsoever. *See Morris*, 672 F.3d at 1198.

---

was resisting the officers and disobeying their commands—notwithstanding that he could not comply with one of those commands.

Granted, some of our cases predating both *Surat* and the incident at issue here have involved suspects who put up some resistance, but those cases are likewise distinguishable because the officers in each continued to use force even after the suspect had been subdued. In *Weigel v. Broad*, for instance, officers tackled a suspect who deliberately ran into oncoming interstate traffic. 544 F.3d 1143, 1147–48 (10th Cir. 2008). Once tackled, the suspect continued to vigorously resist, so the officers put him in a chokehold and bore down on his back, causing him to stop breathing. *Id.* at 1148–49. But "even after it was readily apparent for a significant period of time" that the man was "fully restrained and posed no danger," the officers continued to place pressure on his back, ultimately killing him. *Id.* at 1155.

Similarly, *Perea v. Baca* involved an encounter that occurred after a boy's mother and his neighbor both called 911, reporting that the boy was "on very bad drugs," that he was pacing erratically in his yard and clutching a Bible, and that his mother "was afraid of what he might do." 817 F.3d 1198, 1201 (10th Cir. 2016). The officers, who knew that "they were responding to a verbal fight[,] that no weapons were involved," and that the boy "suffered from mental illness," eventually encountered the boy on his bicycle. *Id.* After an ensuing chase, one officer pushed the boy off his bicycle and, without warning, reached for his hands in an attempt to detain him. *Id.* When the boy struggled, an officer shot him ten times in the chest with a taser. *Id.* At some point before the taserings stopped, the two officers were able to get the boy on the ground, subduing him. *Id.* We held that the officers' conduct violated clearly established law—specifically, that the disproportionate and

15

repeated use of a taser "against a suspect who is effectively subdued" constitutes excessive force. *Id.* at 1204.

Here, by contrast, Christensen stopped using force once Herold had been subdued and handcuffed. Christensen deployed his pepper-spray gun only one time—and he did so after expressly warning Herold, and only after Herold had pulled free from the officers' grasp, was quickly moving his arms toward Christensen, and was provoking Christensen to "[g]o for it" and shoot him. App'x Vol. I at 187. It is true that Christensen deployed the pepper spray from a close distance, contrary to the five-foot minimum range recommended for that pepper-spray gun in its user manual and in violation of the St. George Police Department's pepper-spray policy.[8] But the

---

[8] The dissent suggests that, because Christensen had been trained on the St. George Police Department's pepper-spray policy and the pepper-spray gun's user manual (including its warnings against using pepper spray at a range closer than five feet), a jury could find that Christensen knew or should have known that deploying pepper spray from such a distance would constitute deadly force—thereby making the excessiveness of Christensen's conduct obvious. *See* Dissent at 5–6 & n.4, 8–9.

But even if a jury could find that Christensen knew from his training that his use of pepper-spray against Herold could be lethal, that would not resolve the second prong of qualified immunity. We have held that an officer's subjective knowledge, including knowledge "gained from [an officer's] training," is "irrelevant to the clearly-established-law inquiry." *Frasier v. Evans*, 992 F.3d 1003, 1019 (10th Cir. 2021). Thus, in any qualified immunity case, "[j]udicial decisions are the only valid interpretive source of the content of clearly established law." *Id.* That is so not only because "the standard for qualified immunity is wholly objective," *id.* at 1015, but also because "it is beyond peradventure that judicial decisions concretely and authoritatively define the boundaries of permissible conduct in a way that . . . training never can," *id.* at 1019. Accordingly, officers may still be entitled to qualified immunity *even if* they "subjectively knew—based on their training or from municipal policies—that their conduct violated" the Constitution. *Id.*

To be sure, we have stated that "the reasonableness of an officer's actions must be assessed in light of the officer's training." *Weigel*, 544 F.3d at 1155. And although we have held that unreasonable and excessive force (even as determined by

close distance between Herold and Christensen does not clearly undermine Christensen's use of force: because Christensen was directly atop of Herold, it was not unreasonable for him to use the pepper-spray gun from that position when Herold began to reach for his upper body. And once Herold had been restrained, Christensen did not shoot him again; instead, Christensen and the other officers immediately sought medical attention for Herold and tried to flush the pepper spray from his eye and face. Christensen's use of force was thus limited to subduing Herold while Herold continued to resist, making his conduct materially distinguishable from that of the officers in *Weigel* and *Perea*.

Finally, to the extent that Herold relies on other cases as examples of materially similar precedent, his reliance is misplaced. The other cases Herold cites—to the extent they apply at all to this case—apply only "at a high level of generality." *Mullenix*, 577 U.S. at 16. For instance, although we held in *Fogarty v.*

---

reference to an officer's training) can be obviously unconstitutional "under certain 'extreme circumstances,'" *Frasier*, 992 F.3d at 1015 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (per curiam)), we have only done so in cases where such extreme force was used against a suspect who clearly posed no threat and no resistance whatsoever, *see, e.g.*, *Weigel*, 544 F.3d at 1155; *Morris*, 672 F.3d at 1198; *Davis*, 825 F.3d at 1137; *cf. Lewis v. City of Edmond*, 48 F.4th 1193, 1200 (10th Cir. 2022) (describing cases where our Court held that "the continued use of deadly force was *plainly* unjustifiable" because the suspect in each "had *clearly* been subdued" (first emphasis added)).

As explained, the facts of this case are plainly distinguishable from *Weigel*, *Morris*, and *Davis*: even if the *extent* of Herold's resistance or the threat he posed is debatable, it is undisputed that he posed *some* degree of threat and resistance to the officers. Because of that distinction, neither *Weigel*, *Morris*, nor *Davis* could have placed the illegality of Christensen's conduct "beyond debate," nor made his conduct so egregious as to be an obvious constitutional violation—even in light of his training. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

*Gallegos* that the use of pepper spray "could constitute excessive force," our decision there was concerned with whether certain law-enforcement compliance techniques implicated the Fourth Amendment at all—and, in any event, the facts of that case were almost entirely distinct from those here. 523 F.3d 1147, 1150–53, 1161 (10th Cir. 2008). The excessive-force claims in *Fogarty* arose out of an incident in which officers responding to a protest used "pepper balls and tear gas" against one protestor who had been participating in a drum circle. *Id.* at 1151, 1161. In affirming the denial of qualified immunity to those officers, we concluded that their conduct constituted excessive force under the Fourth Amendment because the protestor was only suspected of a low-level petty misdemeanor (disorderly conduct), was unarmed, was drumming "intermittently and peacefully," presented "no immediate threat to anyone's physical safety," and "was neither actively resisting arrest nor attempting to evade arrest." *Id.* at 1160.

By contrast, here, Herold—although unarmed—was indisputably resisting the officers' attempts to detain and restrain him. Herold also explicitly and repeatedly incited the officers to shoot him. And while the encounter initially began as a mental-health check, it eventually escalated to a point where Herold indisputably assaulted the officers. Thus, by the time Christensen deployed the pepper-spray gun, he had a basis to arrest Herold for (among other things) assaulting a police officer— a more serious offense under Utah law than the low-level petty misdemeanor in *Fogarty*. *See* Supp. App'x at 95–96; Utah Code Ann. §§ 76-5-102.4(2)(a) (assault

18

against a peace officer), 76-8-305 (interference with arresting officer), 76-6-106(2)(C) (criminal mischief (domestic violence)).

Thus, *Fogarty*—like the other cases Herold cites—is so distinguishable from the facts here that it does not clearly govern Christensen's conduct. Instead, *Fogarty* "support[s] [only] the *general* principle 'that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest.'" *Surat*, 52 F.4th at 1279 (emphasis added) (quoting *Morris*, 672 F.3d at 1198). But "the conclusion that [Christensen's] reasons were insufficient to justify his actions simply does not follow immediately from the general proposition that force must be justified." *Mullenix*, 577 U.S. at 16. Without identifying any specific applicable principles, Herold's reliance on *Fogarty* and general rules from other cases "abstract[s] these holdings to the situation here" too much. *Est. of Smart*, 951 F.3d at 1174.

Ultimately, none of these cases would have "provided fair warning to [Christensen] that [his] alleged conduct was unconstitutional." *Id.* at 1168 (quotation omitted). We therefore hold that, at the time of the incident, no case had clearly established that Officer Christensen's forceful takedown of Herold and his use of pepper spray against Herold in response to Herold's resistance would violate the Fourth Amendment.[9]

---

[9] We note that, while this appeal was pending, Herold submitted a letter of supplemental authority pursuant to Federal Rule of Appellate Procedure 28(j) regarding the Supreme Court's recent decision in *Barnes v. Felix*, 605 U.S. _, 145 S. Ct. 1353 (2025), which dealt with the standard for evaluating excessive-force claims. *Barnes*—which did not arise in the context of qualified immunity—ultimately does not affect the clearly established law inquiry in this case. First, *Barnes* was decided

**B.**

Our conclusion that no existing cases clearly established that Christensen's conduct constituted excessive force does not end our analysis, however. As explained, Herold's primary position on appeal is that even if existing cases apply to Christensen's conduct at only a high level of generality, those cases still apply "with obvious clarity," such that Christensen's conduct was an obvious constitutional violation. Aplt. Br. at 18–19 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

The Supreme Court has held that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Hope*, 536 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640). In other words, "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). Thus, in excessive-force cases, we may "conclude a constitutional right was clearly established, even in the absence of similar prior cases, if the force is clearly unjustified" based on the

---

after the incident at issue here. Moreover, although *Barnes* clarified the standard for determining whether an officer's use of force was reasonable, that clarification does not matter for our purposes because the district court concluded under the first prong of qualified immunity that Christensen's use of force here was *not* reasonable (and thus was unconstitutionally excessive).

factors set forth in *Graham v. Connor*, 490 U.S. 386 (1989), alone. *Morris*, 672 F.3d at 1197–98; *see Surat*, 52 F.4th at 1279.[10]

Here, Herold argues that this is a rare "obvious" case because Christensen's use of force was "unquestionably excessive" under the circumstances and in light of Christensen's training, such that the *Graham* factors alone gave Christensen "fair warning" that "his 'aggressive and disproportionate' actions violated Herold's Fourth Amendment rights." Aplt. Br. at 30–31; *see id.* at 34.

But Herold failed to raise this argument before the district court. Instead, Herold argued that the law was clearly established primarily by analogizing his case to *McWilliams* and by distinguishing cases to which Christensen and the City cited in their summary-judgment motion. Herold did cite *Hope* and our cases applying its "obvious clarity" principle, but he only did so when summarizing the substantive standard for clearly established law. Specifically, Herold cited *Hope* for the principle that the law can be clearly established even through factually distinct cases so long as the "state of the law" at the time of the incident gave the defendants "fair warning" that their conduct was unconstitutional. App'x Vol. I at 143. Moreover, Herold only

---

[10] *Graham* sets forth three factors as part of an objective totality-of-the-circumstances test used to evaluate whether an officer's use of force was excessive. 490 U.S. at 396–97. Ordinarily, the *Graham* factors are most relevant in determining whether—under the first prong of qualified immunity—an officer's conduct was unconstitutional. *See, e.g.*, *Surat*, 52 F.4th at 1274. Indeed, the district court here applied *Graham* for that very purpose. *See* App'x Vol. I at 194–98. But we have also held that, in some rare circumstances, the *Graham* factors alone may also clearly establish the unconstitutionality of an officer's excessive force. *See, e.g.*, *Morris*, 672 F.3d at 1198.

relied on the *Graham* factors in his discussion of the first prong of qualified immunity, arguing that a constitutional violation occurred because Christensen's conduct constituted excessive force.

That is far different from arguing that existing precedents apply to this case with "obvious clarity" under *Hope* or that the *Graham* factors alone put Christensen on notice that his use of force was obviously excessive. *Cf. Osborn v. Meitzen*, 2022 WL 17428958, at *2–3 (10th Cir. Dec. 6, 2022) (holding that a litigant waived an "obviousness" argument under *Hope* because, despite passively referencing *Hope* at the district court, she did not argue that *Hope* actually applied or that the officer's force was obviously excessive).[11]  Although Herold stated that "[a]ny reasonable officer would know that the force [Christensen] used was not justified" under the circumstances, App'x Vol. I at 144, he did not explain which "general constitutional rule already identified in the decisional law" actually applied to Christensen's particular conduct "with obvious clarity," as *Hope* requires. *Hope*, 536 U.S. at 741 (quotation omitted).  Indeed, Herold only used the term "obvious" once, in one of his two citations to *Hope*'s standard.  App'x Vol. I at 143.  And Herold's fleeting contentions about "fair notice" are especially unhelpful in light of the plain factual distinctions between this case and those on which he has relied—distinctions he made no effort to address below.[12]

---

[11] Although *Osborn* is unpublished and therefore not binding precedent, we cite it for its persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

[12] Moreover, although the district court also mentioned *Hope*'s "obvious clarity" standard, it did not analyze whether that standard applied to Herold's claims,

Because Herold failed to present his "obviousness" argument before the district court, he forfeited it. *See Havens v. Colo. Dep't of Corrs.*, 897 F.3d 1250, 1259 (10th Cir. 2018) ("We ordinarily deem arguments that litigants fail to present before the district court but then subsequently urge on appeal to be forfeited."). We ordinarily review such forfeited arguments for plain error. *Id.* With that in mind, Herold would need to show that "(1) the district court erred, (2) the error was plain, (3) the error prejudiced his substantial rights, and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Thornton*, 846 F.3d 1110, 1114 (10th Cir. 2017). But Herold has not argued plain error on appeal. We therefore "deem the [obviousness] issue waived (rather than merely forfeited)," and we "decline to review [it] at all—for plain error or otherwise." *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019).[13]

---

either. The district court's failure to address that issue further suggests Herold's putative "obviousness" argument was inadequately presented.

[13] The dissent claims that Herold did not waive his "obviousness" argument because, at the district court, Herold at least argued that the law was clearly established under existing cases, that existing cases need not have exactly the same facts as the case at hand, and that the *Graham* factors show that Christensen's use of the pepper-spray gun was unjustified. *See* Dissent at 15–16 (citing App'x Vol. I at 142–44). But those arguments, which focused on the first qualified-immunity prong and on the theory that the law was in fact clearly established, are distinct from Herold's position on appeal—namely, that this an "obvious case where a body of relevant case law is unnecessary." *Wesby*, 583 U.S. at 65 (quotation omitted). As such, Herold's arguments at the district court were not sufficient to preserve an obviousness argument. And although the dissent is correct that "we must conduct the 'clearly established analysis with full knowledge of settled case law,'" Dissent at 16 (quoting *Baca*, 128 F.4th at 1327 n.5), we need not address an obviousness argument that the plaintiff has failed to preserve or develop, *see Bailey v. Beale*, No. 23-7083, 2025 WL 1662004, at *4 (10th Cir. June 12, 2025) ("The Estate did not develop an

Thus, having concluded that Herold has not shown that "the violative nature of [Christensen's] *particular* conduct [was] clearly established," *Est. of Smart*, 951 F.3d at 1172 (quotation omitted), we hold that Christensen is entitled to qualified immunity from Herold's excessive-force claim.

## III.

Herold's second claim concerns Utah state law.  Herold argues that Christensen's conduct violated the Utah Constitution—specifically, its guarantee of due process and its prohibition of cruel and unusual punishment—and violated §§ 76-2-404 and 408(b) of the Utah Criminal Code, which prohibits law enforcement officers from using deadly force.

But as Herold implicitly acknowledges, the success of his state-law claim rises and falls with the clearly established prong of qualified immunity.  *See Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.*, 16 P.3d 533, 538 (Utah 2000) (holding that a plaintiff may only sustain a private suit for damages alleging violations of the Utah Constitution by demonstrating "a 'flagrant' violation of his or her constitutional rights," which requires that the defendant's alleged conduct "violated 'clearly established' constitutional rights 'of which a reasonable person would have known'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))); *Jensen ex rel. Jensen v. Cunningham*, 250 P.3d 465, 482 (Utah 2011) (same).

---

obvious clarity argument for clearly established law in district court or on appeal, so that argument is waived." (citations omitted)).

Thus, because Herold has failed to demonstrate that Christensen's conduct violated any clearly established right, Herold's state-law claim likewise fails as a matter of law. The district court therefore did not err by granting summary judgment as to Herold's state-law claim.

## IV.

For the foregoing reasons, we AFFIRM.

Entered for the Court


Allison H. Eid
Circuit Judge

25

23-4075, *Herold v. Christensen, et al.*
**PHILLIPS**, J., dissenting.

At summary judgment, we resolve all factual disputes and inferences in Herold's favor, but he bears the burden of overcoming Sergeant Christensen's qualified-immunity defense. To do so, he must make two showings: (1) that Sergeant Christensen used excessive force against him in violation of the Fourth Amendment and (2) that the violation was set by clearly established law then. *See Sanchez v. Guzman*, 105 F.4th 1285, 1292 (10th Cir. 2024). The parties do not dispute the district court's determination that Sergeant Christensen used excessive force against Herold and thus violated his Fourth Amendment rights. So this appeal turns on the "purely legal determination" of whether Sergeant Christensen violated clearly established law in doing so. *Fancher v. Barrientos*, 723 F.3d 1191, 1200 (10th Cir. 2013). Unlike the majority, I would answer that question, "yes," and reverse the district court's order granting Sergeant Christensen's motion for summary judgment, which was based on the clearly-established prong of qualified immunity.

## I.     Standard of Review

We review de novo a district court's grant of summary judgment based on qualified immunity. *Waterhouse v. Direzza*, 129 F.4th 1212, 1220 (10th Cir. 2025). In doing so, we affirm a granted motion only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it

"might affect the outcome of the suit under the governing law" and is "genuine[ly]" disputed if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We view the evidence in the light most favorable to the nonmoving party and draw "all justifiable inferences" in that party's favor. *Id.* at 255. We do so even when deciding "only the clearly-established prong of the [qualified-immunity] standard." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

## II.    Genuine Disputes of Material Fact

In my view, the majority resolves key disputed evidence against Herold. *See id.* at 657–58. Sergeant Christensen knew he used *deadly* force against Herold, and one officer is heard on the video/audio of the encounter telling Sergeant Christensen that Herold could not comply with the order to roll over, because of Herold's positioning on the floor and of the position of the officers restraining him.

A jury hearing this case would see and hear what happened leading up to and during this arrest and shooting. It started with Herold's sister calling the St. George Police Department because Herold's mother needed help with Herold, who was living with her at the time and was suffering from a mental-health condition. After receiving the call, dispatch informed Sergeant Christensen that Herold was "mentally ill," that he had been yelling at his mother, and that Officers Truman and Gardiner—who had already arrived and begun talking to Herold—"were fine at that point." Supp. App. at 58.

2

On arriving at the Herold residence, Sergeant Christensen joined the two officers and Herold inside the residence's garage. For about six minutes, they discussed Herold's medications, his mental health, and whether he wanted to see a therapist. Herold said he wasn't going to talk to any more therapists and walked over to the garage's refrigerator for a root beer. While retrieving the soda, he fumbled its cardboard packaging box, dropping the packaging on the floor. He said, "Aw man," and bent over to collect it. Media Ex. 113-5, at 06:15–06:30. At this, Sergeant Christensen touched Herold's back and ordered Herold to "stay out of the fridge." *Id.* Herold said, "Do not push me," to which Sergeant Christensen responded that Herold was "being detained." *Id.*

Herold threw a soda can across the room and even before being told to do so put his hands behind his back for handcuffing. With Sergeant Christensen behind him, Herold rotated his head rightward and yelled, "If you do anything to my shoulders, I will have all of your fucking badges on my desk in the fucking morning!"[1] Media Ex. 113-4, at 16:40–16:55. Almost immediately, Sergeant Christensen and the officers took Herold to the floor. Herold lay on his back against what appears to be metal shelving with boxes pressed against a wall. There, the three officers gained control over Herold by grasping his legs,

---

[1] Herold had previously informed Officers Truman and Gardiner, but not Sergeant Christensen, that he had two torn rotator cuffs.

3

hands, and torso. They pinned his back to the floor and his left side against the box barrier.

As an officer said, "You're under arrest," Herold writhed and shouted, "You wanna play?" Media Ex. 113-3, at 20:20–20:26. An officer said, "Stop," but Herold squirmed, groaned, and pushed up with his left arm, which the officers pushed back down. *Id.* at 20:26–20:30. Sergeant Christensen, who was alongside Herold's head, said, "Stop or I am going to shoot you in the face with this." *Id.* at 20:30–20:32. Restrained beneath the three officers, a tiring Herold replied, "Go for it. Go for it, I dare you to, you son of a bitch." *Id.* at 20:30–20:36. The officers pushed Herold further against the barrier, and Herold shifted his body while grabbing at the metal shelving unit and shaking it. The officers told him to stop this. Herold responded, "You wanna know something, fuck you!" *Id.* at 20:42–20:46. In the passing seconds, Herold managed to raise and wave his left arm (the one closest to the barrier), but Officer Gardiner grabbed Herold's hand and pressed it against Herold's stomach.

Sergeant Christensen repeated that he would shoot Herold in the face if he kept it up. Herold's resistance waned as he tired, saying, "Go for it, I hope it kills me." *Id.* at 20:50–20:52. Again, Sergeant Christensen said, "Stop," and warned of Herold being shot in the face with "OC."[2] *Id.* at 20:51–20:55. Then

---

[2] "OC is an acronym for oleoresin capsicum. It is an extract of the cayenne pepper plant. OC is the most effective inflammatory agent available today[.]" App. vol. II, at 14.

Herold—not moving beneath the three officers—said, "Oh really, do you think I'm scared?" *Id.* at 20:55–20:58.

Sergeant Christensen directed, "Roll onto your stomach right now." *Id.* at 20:59–21:02. But a jury could find that Herold couldn't roll onto his stomach. He was pinned to the floor and wedged between a wall of boxes on one side of his body and the three officers on the other side. Herold replied, "Fuck you." *Id.* at 21:01–21:03. Sergeant Christensen repeated: "Roll onto your stomach." *Id.* at 21:00–21:04. To that, Officer Gardiner told Sergeant Christensen, "He can't." *Id.*

Ignoring Officer Gardiner, Sergeant Christensen repeated the roll-over order twice more in quick succession, adding, "Right now." *Id.* at 21:04–21:09. All three officers pushed Herold against the barrier as he lay partially on his side. *Id.* at 21:05–21:10. Herold said, "I said, don't fucking touch me," and managed to wave his left arm. *Id.* at 21:07–21:11. At that, Sergeant Christensen shot Herold in the face with his JPX pepper gun from less than three feet—so close that Herold could see "down the barrel" at the "maroon color" cartridge. Supp. App. at 146. That act violated Sergeant Christensen's training and the St. George Police Department's policy prohibiting officers from discharging the JPX pepper gun "at anyone's face or eyes closer than five feet *unless deadly force is authorized*." App. vol. I, at 189 (emphasis added); Supp. App. at 51. The shot—a jet of oleoresin capsicum discharged at a velocity of 405 miles per hour—could be lethal from that range. Sergeant Christensen knew that the shot

5

could have permanently blinded or killed Herold. The pepper jet struck Herold's right eye.[3]

Once shot, Herold covered his eye with his left hand. For about four seconds, the officers continued to push Herold against the barrier. They then pulled Herold from the barrier to gain space to roll him onto his stomach. All told, the three officers had Herold pinned for about fifty seconds from take-down to Sergeant Christensen's firing of the pepper jet. And though Herold survived the point-blank pepper jet, he lost his right eye.

From this, a jury could reasonably find that Sergeant Christensen used deadly force by firing the JPX pepper gun at that distance.[4] Further, a jury could find that Sergeant Christensen used deadly force without giving Herold a chance to comply with the roll-over orders.[5] And finally, a jury could find that

---

[3] The St. George Police Department stopped using the JPX pepper gun soon after this incident.

[4] The evidence establishes a genuine dispute of material fact about whether a reasonable officer would have known that Sergeant Christensen's discharge constituted deadly force. *See* App. vol. I, at 189 (prohibiting St. George Police Department officers from discharging the JPX pepper gun "at anyone's face or eyes closer than five feet unless deadly force is authorized"); App. vol. II, at 9, 19, 21, 26, 33, 35 (JPX user manual pages describing the deadly risks associated with shooting the JPX pepper gun within five feet); *Weigel v. Broad*, 544 F.3d 1143, 1154–55 (10th Cir. 2008) (concluding that the officer's use of deadly force (known or should have known) violated clearly established law, despite no case with the exact type of force used).

[5] Whether a plaintiff was given a "chance to comply with the officer's demands" is a factual issue, *see Lee v. Tucker*, 904 F.3d 1145, 1150 (10th Cir. 2018) (citation modified), that relates to the broader factual issue of whether an

(*footnote continued*)

6

Sergeant Christensen could not have reasonably believed that Herold—an unarmed misdemeanant who three officers had pinned to the floor during a welfare check—posed any threat of serious harm at the moment of deadly force.[6]

## III.    Clearly Established Law

"A right is *clearly established* if it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Love v. Grashorn*, 134 F.4th 1109, 1116 (10th Cir. 2025) (citation modified). To show a clearly established right, Herold may rely on (1) "factually similar precedent already in existence" at the time of the violation; (2) a "consensus of cases of persuasive authority from other jurisdictions"; and (3) precedent that "applies with obvious clarity" even if it is not factually similar. *Id*. (citation modified). Whichever way for a right to be clearly established, the "existing precedent must have placed the statutory or constitutional question beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), providing the officer with "fair

---

officer had probable cause to believe that the suspect posed a threat, *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

[6] "The existence of an immediate danger is an issue of fact, not law." *Love v. Grashorn*, 134 F.4th 1109, 1112 (10th Cir. 2025); *see Est. of Harmon*, 134 F.4th at 1130 (denying qualified immunity because a "factfinder could legitimately determine that . . . [an officer's] mistaken perception of [an imminent] threat would have been unreasonable"); *Finch v. Rapp*, 38 F.4th 1234, 1242 (10th Cir. 2022) (observing that whether an officer reasonably believes that a suspect presents any threat is an "issue of fact").

warning" that his conduct violated the Constitution, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). To ensure this fair warning, we must be careful to define clearly established law with a "high degree of specificity" such that the "unlawfulness of the officer's conduct" would "immediately" follow "from the conclusion that the [legal] rule was firmly established." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018) (citation modified).

We have never squarely faced a case like this one, concerning an officer's deadly use of a pepper gun on an unarmed misdemeanant who was pinned to the floor by three officers. But a plaintiff may rely on "a general constitutional rule already identified in the decisional law" that "appl[ies] with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Hope*, 536 U.S. at 741 (citation modified).

In my view, the *Graham* factors provided Sergeant Christensen fair warning that he could not use deadly force against an unarmed, restrained-but-resistant misdemeanant who a fellow officer advised could not obey the command to roll over or get shot. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *Morris v. Noe*, 672 F.3d 1185, 1197–98 (10th Cir. 2012) (denying qualified immunity because the force used was "clearly unjustified based on the *Graham* factors" alone). In short, Sergeant Christensen knew that the extreme response of deploying his JPX pepper gun three feet from Herold's face—which

8

could have killed Herold—was wholly disproportionate and objectively unreasonable, and thus in violation of clearly established law.[7]

Along this line, we have held that a plaintiff need not have "a court decision with identical facts to establish clearly that it is unreasonable to use *deadly force* when the force is *totally unnecessary* to restrain a suspect or to protect officers, the public, or the suspect himself." *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008) (emphasis added). Here, Sergeant Christensen first threatened deadly force, and then used deadly force because he "felt this was the best option to gain compliance from [Herold]." Supp. App. at 64. The last command Sergeant Christensen gave Herold before shooting him was for him to roll onto his stomach, which Sergeant Christensen repeated several times. But Officer Gardiner told Sergeant Christensen that Herold couldn't comply with the roll-over commands "due to [the officers'] body positioning." *Id.*; *see Emmett v. Armstrong*, 973 F.3d 1127, 1138 (10th Cir. 2020) ("[A]s the purpose of a warning is to obtain compliance, a warning without an opportunity

---

[7] Under *Graham*, we determine the objective reasonableness of the use of force based on three nonexclusive factors: (1) the severity of the crime; (2) the immediacy of a threat to the officers or others; and (3) the resistance of a suspect or an effort to flee. 490 U.S. at 396–97. The second factor—the immediacy of a threat to safety—is "undoubtedly the most important and fact intensive." *Arnold v. City of Olathe*, 35 F.4th 778, 789 (10th Cir. 2022) (citation modified). Though we must judge an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," the balance of the factors weighs so heavily in Herold's favor that *Graham* alone gave Sergeant Christensen fair warning that using deadly force on Herold was objectively unreasonable. *Graham*, 490 U.S. at 396.

to comply is no warning at all." (citation modified)). Considering all the circumstances, a jury could reasonably find that Sergeant Christensen's use of deadly force was totally unnecessary to address Herold's futile and exertion-laden resistance.

Similarly, we have held that "[t]he Fourth Amendment permits an officer to use deadly force *only* if there is probable cause to believe that there is a *threat of serious physical harm to the officer* or to others." *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) (citation modified). And here again, a jury could reasonably determine that Sergeant Christensen intentionally used deadly force on an unarmed misdemeanant despite no threat of serious harm and without a reasonable belief of a threat. *See Zia Tr. Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010) (holding that an officer violated clearly established law because the record permitted the finding that the officer did "not have probable cause to believe that there was a serious threat of serious physical harm" when he used deadly force).[8]

---

[8] The crux of the majority's analysis of clearly established law is that Herold "had pulled [his left hand] free from the officers' grasp" and was "moving" it toward Sergeant Christensen just before Sergeant Christensen deployed the pepper gun. Maj. at 16. Based on this movement, the majority seems to conclude as a matter of legally required fact that Sergeant Christensen reasonably believed that Herold posed a threat sufficient to warrant the deadly use of the pepper gun. *See id.* A jury could reasonably disagree. Though Herold was moving his left arm about, he was pinned to the floor on his back, unarmed, and otherwise restrained by three officers. So the jury could also reasonably find that Sergeant Christensen faced no "*threat of serious physical harm*[.]" *Tenorio*, 802 F.3d at 1164 (citation modified). As the district court

(*footnote continued*)

Moreover, Tenth Circuit cases support the conclusion that Sergeant Christensen violated clearly established law. The state of the law in this circuit on March 13, 2019, provided Sergeant Christensen fair warning that it was unconstitutional for him to use deadly force during a mental-welfare check against an unarmed misdemeanant who did not pose a threat of serious physical harm to the officers or others.

In *Fogarty v. Gallegos*, for example, this court considered a claim for excessive force under the Fourth Amendment. 523 F.3d 1147 (10th Cir. 2008). That suit was brought by Fogarty against multiple officers who had used "pepper balls and tear gas" against him before forcefully arresting him for his involvement as a drummer at a protest (the arrest was purportedly for disorderly conduct, a "petty misdemeanor" under applicable state law). *Id.* at 1160–61. The district court denied the officers qualified immunity, the officers appealed, and we affirmed. *Id.* at 1150. We began by noting that a Fourth Amendment claim of excessive force is considered under the objective reasonableness standard: "whether the force used by the [officers] was reasonable under the facts and circumstances presented." *Id.* at 1159. We concluded that Fogarty's disorderly conduct (drumming at the protest) wasn't

---

found, "Herold's manifest intentions were resistance, not aggression." App. vol. I, at 197 (concluding that "[a] reasonable officer would not have probable cause to believe that Mr. Herold posed a potential threat of serious physical harm to the officer or others").

11

sufficiently dangerous to justify the level of force used. *Id.* at 1160. The excessive force included shooting Fogarty with a "pepper ball" and "forcibly escort[ing] him through a cloud of tear gas." *Id.* at 1159, 1161. We noted that "in prior cases, we have assumed that the use of mace and pepper spray could constitute excessive force." *Id.* at 1161–62 (collecting cases). The officers purportedly used such force to stop the protest-drummers, including Fogarty, in hopes of gaining control of the protest. *Id.* at 1152, 1157. On the other side of the reasonableness scale, we observed that Fogarty was suspected of only a "petty misdemeanor," that he was "unarmed," that there was "no suggestion that [his drumming] posed an immediate threat to the safety of the officers or others," and that he did not "resist[] arrest or attempt[] to evade arrest." *Id.* at 1160. Thus, we ruled that the officers' use of the pepper ball and tear gas was "unreasonable under the circumstances" and violated Fogarty's Fourth Amendment rights. *Id.* at 1161.

And in *Perea v. Baca*, officers were called to perform a "welfare check" and were "informed that . . . no weapons were involved." 817 F.3d 1198, 1201 (10th Cir. 2016). After arriving at Perea's home and discovering that he had recently departed on his bicycle, the officers went searching for him in two separate patrol cars. *Id.* When Perea spotted the officers' patrol car he began to pedal faster, and so the officers turned on the vehicle's emergency lights. *Id.* According to the officers, Perea still did not stop and "instead pedaled through a stop sign without slowing down." *Id.* So the officers used their patrol cars to

12

corner Perea into a parking lot and proceeded to chase Perea on foot. *Id.* The first officer to catch up with Perea pushed him off his bicycle and attempted to restrain him. *Id.* Perea "struggled," "thrashed," and "sw[ung] a crucifix." *Id.* at 1201, 1203. In response to Perea's resistance, one officer instructed another officer to tase Perea. *Id.* at 1201. After the first taser deployment, the officer tased him nine more times, leading to his death. *Id.*

In considering whether the officers' "actions were objectively reasonable" under "the totality of the circumstances," we observed that the "officers were performing a welfare check," not "looking for [Perea] because they suspected he had committed a crime." *Id.* at 1202. Nevertheless, we explained, to the extent that Perea was tackled for a traffic violation (failing to stop at a stop sign on his bicycle), such a violation would "at most" "support[]" the use of minimal force." *Id.* at 1203. Next we determined that "any threat posed stemmed from Perea resisting arrest," but the officers did not argue that "Perea posed a threat before [the officers] initiated the arrest." *Id.* Additionally, we noted, though Perea's resistance warranted "the use of *some* force during the period in which Perea was resisting," that "Perea's resistance (thrashing and swinging a crucifix) did not justify the officers' severe response" of repeatedly tasing him (deadly force). *Id.* So, because it was "clearly established law in the Tenth Circuit that the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to

13

others constitutes excessive force," we affirmed the district court's denial of qualified immunity to the officer. *Id.* at 1204–05.

In March 2019, *Fogarty* and *Perea* had shown that it was "clearly established law in the Tenth Circuit that the use of disproportionate force," in the form of a pepper gun, "to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force." *Perea*, 817 F.3d at 1204; *Fogarty*, 523 F.3d at 1161 (establishing that a pepper ball can "constitute excessive force"). Here, Herold was not suspected of committing a serious crime—the officers were responding to a mental health check, as in *Perea*. *See* 817 F.3d at 1202. Also, like the plaintiffs in both *Fogarty* and *Perea*, Herold did not pose a threat of serious harm to the officers or anyone else when Sergeant Christensen deployed the JPX pepper gun—indeed he was unarmed, pinned down by three trained officers, and pushed against a barrier and unable to comply with the command to roll over. *See Fogarty*, 523 F.3d at 1160 (no threat of serious harm by unarmed suspect); *Perea*, 817 F.3d at 1202–03 (no threat of serious harm by unarmed suspect who was being held down by multiple officers). So though "the use of *some* force" during the period in which Herold was resisting may have been warranted, *Perea*, 817 F.3d at 1203, under the circumstances Sergeant Christensen had "fair warning" that any degree of deadly force was disproportionate and objectively unreasonable, and thus in violation of clearly

14

established law, *Est. of Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020).

## IV.    Forfeiture and Waiver

Though the majority considers whether the law was clearly established by factually similar precedent, it declines to consider whether the unlawfulness of Sergeant Christensen's conduct was sufficiently clear "even though existing precedent does not address similar circumstances." Maj. at 20 (quoting *Wesby*, 583 U.S. at 64). The majority chooses not to address Herold's obvious-clarity argument on the ground that he forfeited it before the district court and then waived it by failing to argue plain error on appeal. *Id.* at 23–24 & n.13.

I disagree with the majority that Herold has not preserved his clearly-established-law argument. In the district court, Herold contended that Sergeant Christensen violated clearly established law. He cited supporting case law, and he spent several pages distinguishing Sergeant Christensen's cases. He specifically argued that "qualified immunity does not apply," because "[a]ny reasonable officer would know that [Sergeant Christensen's] force was not justified." App. vol. I, at 142, 144. He explained that "there is no requirement that a case have exactly the same facts as the one before the [c]ourt in order to clearly establish the contours of the constitutional violation." *Id.* at 143. He also quoted our principle that "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* (quoting *Morris*, 672 F.3d

15

at 1196). And he argued that *Graham* and our precedents show that Sergeant Christensen's use of the JPX pepper gun "could not possibly have been justified" and that a jury could find that its use was "completely unnecessary." *Id.* at 146–47.

In sum, Herold has consistently contended that Sergeant Christensen's conduct violated clearly established law. Because Herold indisputably invoked the clearly established issue, we must conduct the "clearly established analysis with full knowledge of settled case law," which, at minimum, must include general legal rules that apply with obvious clarity. *Baca v. Cosper*, 128 F.4th 1319, 1327 n.5 (10th Cir. 2025); *Love*, 134 F.4th at 1117 ("[O]nce the plaintiffs urged a clearly established right based on the absence of an immediate danger, we incurred an obligation to conduct our own legal research to determine the clarity of a constitutional violation.").

## V.　Conclusion

I would reverse the district court's grant of summary judgment on the clearly established prong of the qualified-immunity issue and its dismissal of the state-law claims.

16